IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STATE FARM FIRE AND CASUALTY CO., | : | No. 1:23-cv-01661 |
| **Plaintiff** | : | |
| | : | **(Judge Kane)** |
| v. | : | |
| | : | |
| PPL ELECTRIC UTILITIES CORP., | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Before the Court are Plaintiff State Farm Fire and Casualty Co. ("Plaintiff")'s fully briefed motion to exclude certain testimony and opinions of Michael E. Schaal pursuant to Federal Rule of Evidence 702 (Doc. No. 31) and Defendant PPL Electric Utilities Corp. ("Defendant")'s fully briefed motion to exclude certain testimony and opinions of Lee McAdams and Michael Wald pursuant to Federal Rule of Evidence 702 (Doc. No. 30).  Neither Plaintiff nor Defendant requested a hearing on the pending motions.  Upon careful consideration of the briefing, exhibits, and applicable law, and for the reasons provided herein, the Court will grant in part and deny in part each motion.

## I.    BACKGROUND

This case arises from a residential fire that occurred on May 10, 2022 at the home of Loretta Black.  (Doc. Nos. 35 at 1, 32 at 2.)  Ms. Black held a homeowner's insurance policy through Plaintiff.  (Doc. No. 1 at 1.)  On October 5, 2023, Plaintiff initiated the instant action by filing a complaint against Defendant (Doc. No. 1), alleging that "[a]s a result of claims made on said policy in connection with the [fire], Plaintiff became subrogated to certain recovery rights and interests," and that Defendant was negligent in managing the electrical supply line near Ms. Black's home, causing the fire.  (Id.)  The parties agree that the fire started when metal splices,

or "bugs," on the electrical supply lines that connect Defendant's power line to Ms. Black's home collided with each other and sprayed sparks, causing the ignition of the fire. (Doc. Nos. 35 at 1, 32 at 2.) It is also undisputed that the bugs were not insulated at the time of the fire, meaning that there were no protective covers to prevent sparking. (Id.) However, the parties dispute the condition of the bugs prior to the fire. (Id.) Plaintiff alleges that Defendant was negligent in its "duty to manage the [] electrical lines . . . in a manner that would avoid foreseeable harm" (Doc. No. 1 at 3), in particular by failing to "properly replace or properly install necessary covers, insulation, and/or protective material on the connectors for the electrical line" (Doc. No. 9 at 1).

After Defendant filed its answer to Plaintiff's complaint (Doc. No. 5), the parties filed a case management plan (Doc. No. 9), after which the Court held a case management conference with the parties and issued a case management order (Doc. No. 11). The Court set a June 28, 2024 fact discovery deadline and expert report deadlines of July 31, 2024 for Plaintiff and September 6, 2024 for Defendant. (Id.) On June 24, 2024 and again on August 28, 2024, the Court granted extensions of the case management deadlines. (Doc. Nos. 13, 20.) On February 25, 2025, the Court held a status conference with the parties and issued an Order establishing a June 6, 2025 deadline for the filing of any Daubert motions. (Doc. No. 24.) On June 6, 2025, the parties each filed their Daubert motions (Doc. Nos. 30, 31), which are fully briefed (Doc. Nos. 32, 33, 35, 36) and ripe for disposition.[1]

---

[1] The Court finds that the record here is adequate for resolution of the pending motions despite the fact that neither party requested, and the Court has not held, an evidentiary hearing on the motions. Plaintiff's experts authored one and two reports respectively, and each sat for a deposition. Defendant's expert authored a report and sat for a deposition. This record constitutes a sufficient basis upon which to decide the motions. See Oddi v. Ford Motor Co.,

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  See Fed. R. Evid. 702.  Rule 702 states, in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

See Fed. R. Evid. 702.

As the United States Court of Appeals for the Third Circuit has explained, "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."  See Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).  The rule imposes an obligation on district court judges to act as "gatekeepers" to ensure that an expert witness's testimony meets those three threshold requirements before consideration by a jury.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).  In fulfilling its obligation as a gatekeeper, a court exercises discretion when deciding whether to admit or deny expert testimony.  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146–47 (1997). Rule 702 was amended in 2023 to make clear that "expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered

234 F.3d 136, 151–55 (3d Cir. 2000) (finding that an evidentiary hearing was not required given that "the evidentiary record pertaining to Oddi's expert was far from scant").

3

testimony meets the admissibility requirements set forth in the rule." See Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

When considering the qualification requirement, a court must discern whether a purported expert has specialized knowledge in a given field. See Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). No particular background or credentials are necessary to establish the requisite specialized knowledge, as "a broad range of knowledge, skills, and training qualify an expert." See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994); accord Waldorf v. Shuta, 142 F.3d 601, 627 (3d Cir. 1998) (noting that a proposed expert witness's generalized knowledge or practical experience may be sufficient to qualify him as an expert). The Third Circuit has instructed courts to "eschew[] imposing overly vigorous requirements of expertise," but the determination is not a mere formality, and the Court's assessment of a proposed expert's qualifications is predominantly a fact-specific endeavor that is governed by the unique circumstances in each case. See Voilas v. Gen. Motors Corp., 73 F. Supp. 2d 452, 456 (D.N.J. 1999) (quoting United States v. Velasquez, 64 F.3d 844, 849 (3d Cir. 1995)).

As to reliability, the United States Supreme Court has held that the gatekeeping function requires the trial court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." See Kumho Tire, 526 U.S at 152. To meet this requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable," but the "evidentiary requirement of reliability is lower than the merits standard of correctness." See Pineda, 520 F.3d at 244 (quoting In re Paoli, 35 F.3d at 744). The expert's opinion "must be based on the methods and procedures of

4

science rather than on subjective belief or unsupported speculation." See In re TMI Litig., 193 F.3d 613, 664 (3d Cir. 1999). "The focus is not upon the expert's conclusions, but rather upon his methodology; the issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions." Burke v. TransAm Trucking, Inc., 617 F. Supp. 2d 327, 331 (M.D. Pa. 2009) (citing In re Paoli, 35 F.3d at 746). When evaluating the reliability of a witness's methodology, a court is guided by several factors drawn from Daubert:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

See In re Paoli, 35 F.3d at 742 n.8. The inquiry is flexible, and each listed factor "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." See Kumho Tire, 526 U.S. at 150. The court should also consider any other relevant factors. See Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003).

As to fit, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." See Schneider, 320 F.3d at 404. "Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 591-92. Indeed, an expert who renders an opinion based on factual assumptions not present in the case or opines on a matter that does not relate to a disputed issue

is not relevant and, thus, will not assist the trier of fact, as required by Rule 702.  See id.  For example:

> The study of the phases of the moon . . . may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact.  However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

See id.  Like the typical relevance inquiry, "the standard for analyzing the fit of an expert's analysis to the case at hand is 'not that high.'"  See United States v. Ford, 481 F.3d 215, 219 n.6 (3d Cir. 2007) (quoting In re Paoli, 35 F.3d at 745).  Still, expert testimony can be powerful and misleading because of the difficulty in evaluating it, and the Third Circuit has cautioned that "district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of Daubert."  See id. at 219 n.6.

## III.   DISCUSSION

As an initial matter, to provide context to the opinions proffered by and challenged by the parties, the Court briefly reviews the law relevant to the pending negligence claim before addressing each motion.

### A.   Relevant Law[2]

---

[2]  The Court here references the Pennsylvania negligence standard.  However, Plaintiff does not articulate which state's substantive law it believes applies to its negligence claim, or cite a specific standard in its filings.  In the absence of the parties' reference to a body of law other than Pennsylvania law, the Court assumes that Pennsylvania law applies.  The Court notes this shortcoming because the Daubert standard requires assessment of whether the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue."  See Fed. R. Evid. 702(a).  It is, of course, more difficult for a party to meet this burden without reference to the specific legal standard at issue.

To prevail on a negligence claim under Pennsylvania law, a plaintiff must establish: (1) a duty owed to the plaintiff; (2) a breach of that duty by the defendant; (3) a causal connection between the defendant's breach and the resulting injury; and (4) injury suffered by the plaintiff. See Estate of Zimmerman v. Se. Pa. Transp. Auth., 168 F.3d 680, 684 (3d Cir. 1999) (citing Estate of Swift v. Northeastern Hosp. of Phila., 690 A.2d 719, 722 (Pa. Super. Ct. 1997)).  To prove the breach of a legally recognized duty or obligation of the defendant, the plaintiff must show that "the defendant's act or omission fell below the standard of care, and therefore, increased the risk of harm to the plaintiff."  See Green v. Pa. Hosp., 123 A.3d 310, 316 (Pa. 2015) (citing Scampone v. Highland Park Care Ctr., LLC, 57 A.3d 582, 596 (Pa. 2012)).

**B.     Defendant's Motion to Exclude the Opinions and Testimony of Lee McAdams and Michael Wald**

**1.     The Proposed Expert Report and Testimony of Lee McAdams**

Plaintiff tendered Lee McAdams to "conduct an origin and cause investigation of [the] fire loss" at issue in this case.  (Doc. No. 34 at 71.)  He issued a report and sat for a deposition.  (Doc. No. 34.)  He does not provide a numbered list of conclusions, but in the "SUMMARY" section of his report, he states as follows:

> Based on my examination of the scene and information from Chief Brian Enterline and Loretta Black, it is my opinion the fire originated outside of the building, on the sofa located on the 2nd floor balcony of 2452 N. 4th Street.  This was from the electrical lugs made of an aluminum alloy coming in contact with each other from the power cables of 2450 N. 4th Street.  This resulted in electrical arcing, spraying sparks onto the sofa.
>
> The line was apparently repaired by PP&L last fall and no insulators were used to prevent this.  I have not been in touch with PP&L.
>
> I did not see anything else that would have caused the fire, or anything suspicious about the fire.

7

(Doc. No. 34 at 73.)  Defendant does not challenge the first or third paragraphs.  Defendant only seeks to exclude the statement that "[t]he line was apparently repaired by PP&L last fall and no insulators were used to prevent this.  I have not been in touch with PP&L."  (Id.)  Defendant challenges this opinion, stating that it "is not supported by any facts or data, any scientific analysis or methodology, or even the opinion of Plaintiff's electrical engineering expert witness." (Doc. No. 30 at 10–11.)  Defendant further argues that the statement is "based on assumptions and not supported by any methodology," and that Mr. McAdams "offer[s] no facts or data evidencing how or when the subject bug connectors were installed on the power lines to the Insured Premises, let alone who installed them."  (Doc. No. 33 at 9.)  Plaintiff responds that "Defendant seeks to claim that Mr. McAdams lacks a foundational basis for his claims, thus questioning his qualifications. This is false."  (Doc. No. 36 at 4.)  The Court turns first to an assessment of Mr. McAdams's qualifications.

### a.      Qualifications

Plaintiff asserts that Mr. McAdams has the necessary qualifications because he "has participated in three specialized training courses in his lengthy career as a fire investigator for electrical fires only," because his "other training sessions also cover some general electrical fire discussions," and most of "his experience comes from dealing with Pennsylvania power companies."  (Id. at 5.)  Plaintiff also cites Mr. McAdams's deposition, in which he articulates his "years of training and experience at different fires," and "training courses," and "talking to electricians and electrical experts and stuff like that . . . in a lot of different situations."  (Id.) Defendant does not directly argue that Mr. McAdams fails to meet Rule 702's qualifications

requirement, but does assert that "McAdams does not have any specialized expertise in installing connectors on electric power lines." (Doc. No. 30 at 11.)

Upon careful consideration of the parties' briefing and exhibits, and the applicable law, and for the following reasons, the Court concludes that Mr. McAdams may be marginally qualified to offer opinions and testimony in this case, but because the Court will exclude his challenged opinion for lack of reliability, the Court will reserve for now its ultimate judgment as to his qualifications with respect to any remaining testimony or opinions that Plaintiff should seek to offer. According to Mr. McAdams's curriculum vitae ("CV"), he obtained an Associate's Degree in Fire Science from Delgado College in New Orleans, Louisiana—although he does not list a date of conferral or the dates of his attendance. (Doc. No. 34 at 68.) He appears to own and operate Lee McAdams Fire & Explosion Investigations, LLC, where he is "Investigator/President." (Id.) He has held other employment, though he again provides no dates. He was at one point a "Fire Fighter/Fire Marshal/Officer" for the Jefferson Fire Department in Louisiana, as well as a "Fire Investigator/Inspector" for the Kenner Fire Department, also in Louisiana. (Id.) He also held various positions with "INS Investigations Bureau, Inc." in Louisiana, Florida, and Pennsylvania. (Id.) He has also participated in a number of "specialized training" courses, including at various universities and academies, on subjects such as "Fire Science," "Fire Investigations," and "Electrical Fires and Causes," but his CV contains no description of when he attended these courses or what they entailed. (Id. at 68–69.) Mr. McAdams also states that he has been qualified as an expert "in numerous Judicial and Federal Courts in 4 states, totaling over 25 cases," although he does not list any cases in which

9

he has appeared.[3] (Id. at 69.)  He further states that he has been conducting "[f]ire origin and cause investigations, as well as fraud investigations . . . for over 35 years," and that he has "conducted over 5,500 fire investigations." (Id.)

The Court is not persuaded that Plaintiff has met its burden with respect to Mr. McAdams's qualifications in this matter, particularly given the lack of specifics in Mr. McAdams's CV, the failure of his report to fully comply with Federal Rule 26, and the failure to articulate the nexus between his experience and some of the relevant subject matter—specifically with respect to the challenged basis, Defendant's assertion that "McAdams does not have any specialized expertise in installing connectors on electric power lines" (Doc. No. 30 at 11). However, because the Court will exclude the challenged opinion for lack of reliability, and because Defendant does not squarely challenge Mr. McAdams's general qualifications to offer testimony, the Court will refrain from a fulsome analysis of his qualifications at this time.  Still, the Court notes that—although it would be a better practice to provide a more thorough and clear recitation of one's background—Mr. McAdams appears to have extensive experience with fire investigations and, as to his fire cause and origin inspection, may meet the liberal qualification threshold of Rule 702, wherein "a broad range of knowledge, skills, and training qualify an expert." See In re Paoli, 35 F.3d at 741; see also Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996) (stating that it would be "an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the

---

[3] Under Federal Rule of Civil Procedure 26, an expert report "must contain . . . a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." See Fed. R. Civ. P. 26(a)(2)(B)(iv).  Mr. McAdams has not included such a list. The Court also notes that Mr. McAdams's report does not appear to include "a statement of the compensation to be paid for the study and testimony in the case" as required by Rule 26(a)(2)(B)(v).

proposed expert does not have the specialization that the court considers most appropriate"). The Court turns now to an assessment of the reliability of Mr. McAdams's challenged opinion.

**b.       Reliability**

Defendant challenges the reliability of Mr. McAdams's statement that: "[t]he line was apparently repaired by PP&L last fall and no insulators were used to prevent this.  I have not been in touch with PP&L."  (Doc. No 34 at 73.)  Defendant argues that this statement "is not supported by any facts or data, any scientific analysis or methodology, or even the opinion of Plaintiff's electrical engineering expert witness."  (Doc. No. 30 at 10–11.)  In response, Plaintiff asserts that Defendant, through "creative editing, and casual omissions of the record," attempts to "piece together various statements to present an idea that Mr. McAdams simply chose the theory that defendant installed the bugs."  (Doc. No. 36 at 6.)  Plaintiff claims further that Defendant's motion as to reliability "relies on a single piece of evidence: their own designee's affidavit which claims that defendant does not use the type and style of bug pictured at the house."  (Id. at 5.)  Plaintiff states that the "existence of the affidavit itself is highly questionable."  (Id.)  Plaintiff misstates the issue before the Court.  The relevant inquiry under Rule 702 is whether Plaintiff, the proponent of the testimony, has demonstrated "to the court that it is more likely than not" that "the testimony is the product of reliable principles and methods."  See Fed. R. Evid. 702.

In his report, Mr. McAdams states: "I have formed my opinions based on my examination of the scene and my knowledge and reference to [National Fire Protection Association ("NFPA")] 921 and NFPA 1033 guidelines, along with information from Harrisburg Fire Chief Brian Enterline."  (Doc. No. 34 at 71.)  Mr. McAdams examined the scene of the fire on May 16, 2022, at which time "no one else was present initially, but the fire chief came later."

11

(Id.)  Mr. McAdams observed that "[t]he neighbor's 2nd floor rear balcony had heavy fire damage on it, especially a heavily burned sofa. It clearly appeared to be the point of origin and I found nothing on the balcony to indicate what had occurred to have caused the fire."  (Id. at 72.)

Mr. McAdams states further that:

> Once Fire Chief Brian Enterline arrived, he told me that the occupant of this unit, Shanita Jones, had seen sparks from the neighbor[']s power lines and did not think anything much of it since she thought it was normal with the wind. Shortly later she saw her sofa on the balcony on fire and the lines were sparking worse.
>
> The chief then noticed there were no coverings on the connectors for the power lines and there were signs of arcing of the metal connectors that he said the power company referred to them as "Bugs". I could see the electrical activity that occurred on these, causing the sparks to rain down and over slightly to the neighbor's sofa on the balcony.
>
> These are actually "Lugs" made of an aluminum alloy that connect the power cable from the pole to the cables coming up from the meter pan and pole. These connections are normally done by the power company and should have had a rubber boot of some sort on them so they never come in contact with each other. This was missing from these. The neighbor's home had lug covers.

(Id.)  In a section of his report titled "INVESTIGATION," Mr. McAdams details certain bases for his ultimate conclusions:

> The chief thought Mrs. Black had an electrician do this, but this is not normally done by an electrician for a home. She said she never had any electrician do any work on her home. She reported a line down in her back yard to PP&L and said they repaired it. She said something happened and the line got cut in the fall of last year and a bunch of guys were out repairing it. The line crosses the back alley and may have been caught by a garbage truck or other type truck.
>
> It is not common for an electrician to do any work above the meter of a structure. This connection is normally done by the power company. These lugs can start out separated, but with wind and other forces of nature, they can eventually come together. That is why they use the insulators to protect them from this type of event if they came together.

(Id.)  Mr. McAdams was asked about the above in his deposition:

12

Q.      The next paragraph of your report notes that these are actually, quote, lugs made of an aluminum alloy. What—how do you know that they were made of an aluminum alloy?

A.      I think he may have told me that.

Q.      He, being Chief Enterline?

A.      Yes.

Q.      And did you do any sort of research on the lugs or connectors or bugs that you observed at the scene?

A.      I did, but it didn't—it didn't do me much justice for anything. You know, sometimes we look things up, and it's not what you're looking for.

Q.      Were you able to observe any sort of number or other identifying feature on the bugs that would've helped with that?

A.      No.

Q.      So is it fair to say that you don't know where those bugs came from?

A.      I do not.

Q.      The next sentence in the report states that, these connections are normally done by the power company. That goes on, and I'll get to the rest later. But when you say normally done, that's not to say that they aren't ever or can't ever be done by someone other than the power company, correct?

A.      Well, I can't—I can't say correct to that. I'm not—I'm not sure. I—I have always been under the understanding and impression that anything above the meter was done by the power company that handles that area, which in this case would be PP&L. And from about—just about any place I've ever been, it's always been that way, that the—that electricians don't normally fool with that. It's usually the—the electric company.

Q.      You say under the impression, where—what is that impression based on?

A.      Years of training and experience at different fires and—and training courses and—and talking to electricians and electrical experts and stuff like that, you know, in—in a lot of different situations.

13

Q.    How much of that experience would be specific to Pennsylvania and Pennsylvania power companies?

A.    A lot.

. . .

Q.    Your report also notes that the neighbor's home had lug covers. How were you able to observe the neighbor's lugs?

A.    'Cause they were on the other side of her deck.

Q.    Do you know with certainty that they were metal lugs with covers or whether they were insulated lugs?

A.    I—I don't know.

Q.    Do you know whether the lugs that you observed on the neighbor's property are the type usually used by PP&L?

A.    I don't know what type they usually are. In any case, because of—I don't think I've ever had a case like this. But—but they definitely had a different look. The two different kind had a different look. Now, I don't know if that's standard for any particular power company or not. I don't—I don't know. But they—there were two different types of lugs.

Q.    When you say two different types of lugs, did you observe differences other than one being—having an insulation and one not?

A.    They looked like they might've been a different type.

Q.    And are you basing that on anything other than your visual observation at the scene?

A.    Nothing—nothing other than my visual.

(Doc. No. 34 at 33–37.) Mr. McAdams was also asked specifically about the statement that

Defendant challenges:

Q.    All right. The last thing I want to touch on is the—this is the last part of the sentence. The line was apparently repaired by PP&L last fall and no insulators were used to prevent this. So the last part of that sentence, no

14

insulators were used, you're basing that on the condition of the connectors when you saw them in May 2022, right?

A.    Yes.

Q.    But you don't know whether they were insulated in any way back in fall of 2021?

A.    I do not.

. . .

Q.    Sir, do you think that you can say to a reasonable degree of certainty that PP&L repaired the power line to Loretta Black's house before this fire happened, based on the facts that you know?

A.    Yes.

Q.    And those facts are what Loretta Black told you?

A.    The facts are that—like it was PP&L that would've done the work and lugged them off. I mean I—there's—I don't know. That's—I don't know what to say.

(Id. at 60–65.)

Upon careful consideration of the parties' briefs, Mr. McAdams's report and deposition, the record in this case, the applicable law, and for the following reasons, the Court finds that Plaintiff has failed to meet its burden to demonstrate that the statement of Mr. McAdams that "[t]he line was apparently repaired by PP&L last fall and no insulators were used to prevent this. I have not been in touch with PP&L" (Doc. No 34 at 73) is the product of reliable principles and methods.  At the outset, the Court notes that it does not assess the reliability of Mr. McAdams's methodology as applied to his unchallenged conclusions, namely as to the cause and origin of the fire.  See (Doc. No. 34 at 73).  Courts have found that a fire investigator may rely on personal observations, the reports of other investigators, photographs, and similar material in drawing

15

conclusions in the field of fire cause and origin.  See United States v. Gardner, 211 F.3d 1049, 1054 (7th Cir. 2000) (internal citations omitted) (articulating that a fire cause and origin expert's "reliance on reports, photographs, and third-party observations, which may not have been admissible into evidence, served as a reliable basis for his testimony because these materials are facts or data of a type reasonably relied upon by experts in the field of fire cause and origin"); see also Seneca Ins. Co. v. Beal, 820 F. App'x 106, 108 (3d Cir. 2020) (unpublished) (finding that the district court did not abuse its discretion in permitting a fire investigation expert's testimony where he relied on "personal observations and review of materials from the fire investigation," including "several hundred photographs, videos, and other documentation provided by the township, fire marshal, and individuals who were at the scene of the fire"). Although Mr. McAdams's conclusions as to the cause and origin of the fire, which were based on similar materials, may meet the reliability threshold, the Court cannot discern an articulated methodology as to the challenged statement.

Plaintiff does point generally to Mr. McAdams's use of his "personal observations" as well as his experience as a fire investigator.  (Doc. No. 36 at 6–7.)  Mr. McAdams, in his report, also states that in general he formed his opinions "based on [his] examination of the scene and [his] knowledge and reference to NFPA 921 and NFPA 1033 guidelines, along with information from Harrisburg Fire Chief Brian Enterline."  (Doc. No. 34 at 71.)  Courts in the Third Circuit have found that the "NFPA 921 is typically considered to 'provide[] a reliable fire causation determination methodology.'"  See Ford v. Ford Motor Co., 311 F. Supp. 3d 667, 679 (D.N.J. 2017) (quoting State Farm Fire & Cas. Co. v. Steffen, 948 F. Supp. 2d 434, 439 n.6 (E.D. Pa. 2013)).  However, simply referencing the NFPA guidelines is insufficient to establish one's

16

methodology as reliable.  See Steffen, 948 F. Supp. 2d at 446 (finding that the expert's "failure to base his opinion on facts and data and faithfully apply the NFPA 921 procedure and scientific method" renders his opinion unreliable); see also United States v. Zhou, No. 06-cr-00286, 2008 WL 4067103, at *6 (D.N.J. Aug. 25, 2008) (stating that "there is nothing to suggest that he applied the methodology required by NFPA 921, and [the expert's] report appears based on subjective belief, rather than scientific methods").  Although Mr. McAdams references the NFPA, nowhere does he describe how it informed his process or helped him to arrive at the opinion challenged here.  As in Zhou, where the district court excluded the proffered expert's testimony, the "only indication that [he] utilized the NFPA 921 is in the report's [introduction]." See Zhou, 2008 WL 4067103, at *5.

Moreover, Mr. McAdams appeared to undermine his own statement when asked about it in his deposition: "[b]ut you don't know whether [the bugs] were insulated in any way back in fall of 2021?" he responded: "I do not." (Doc. No. 34 at 60–62.)  In his deposition, he also acknowledged, as Defendant articulates, that he "does not know where the subject bug connectors came from," his "attempt at conducting research about them was unsuccessful," he "does not know what type of bug connector PPL uses to connect its service drops to customer homes," and he has "no reason to dispute Mr. Grosz's testimony that PPL does not use the bug connectors that were on the power lines."  (Doc. No. 33 at 10.)  Furthermore, Plaintiff does not cite to any authority in the relevant section of its brief, and draws no parallels to other cases where similar methods were employed or deemed sufficiently reliable.  Given these gaps, and the lack of a sufficiently articulated methodology, the Court concludes that Plaintiff fails to demonstrate that the resulting conclusion amounts to more than ipse dixit.  See (Doc. No. 34 at

17

65) (in which Mr. McAdams states that "[t]he facts are that—like it was PP&L that would've done the work and lugged them off"). "[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the <u>ipse dixit</u> of the expert." <u>Joiner</u>, 522 U.S. at 146; <u>see also</u> <u>Pappas</u>, 136 F. Supp. 2d at 425 (finding that a party failed to meet its burden to demonstrate that the expert's opinion was reliable where the "opinion is based on nothing more than his training and years of experience as a fire investigator and engineer").

Plaintiff's failure to meet its burden is particularly evident when the Court attempts to map Mr. McAdams's methodology onto the <u>In re Paoli</u> factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

See <u>In re Paoli</u>, 35 F.3d at 742 n.8. The inquiry is flexible, but the Court can only find a single factor—factor seven, as to Mr. McAdams's qualifications in the field— that weighs in favor of Plaintiff as to the challenged statement. It is well-recognized that the factors may carry different weight in different circumstances. See <u>Kumho Tire Co.</u>, 526 U.S. at 151 (stating that <u>Daubert</u>'s "list of factors was meant to be helpful, not definitive"). The fire investigation methods that Mr. McAdams described employing to arrive at his conclusions regarding the cause and origin of the fire may well be generally accepted and governed by recognized standards, which would carry weight as to factors four through six. However, Defendant does not challenge Mr. McAdams's testimony in that regard. As applied to the specific challenged conclusion, the Court cannot find

18

that these same factors favor Plaintiff; as described above, Mr. McAdams fails to supply the requisite nexus between his methods and conclusion, causing it to be impermissibly speculative and based in ipse dixit.  There is also no indication that factors one through three are met. Because the Court will exclude this opinion for lack of reliability, the Court need not assess its fit to the facts of this case, and turns next to the assessment of Mr. Wald's opinions and testimony.

### 2.      The Proposed Expert Report and Testimony of Michael Wald

Plaintiff tendered Michael Wald to "assist in determining the cause of [the] fire."  (Doc. No. 30-8 at 3.)  He issued an initial report (Doc. No. 30-8), a supplemental report (Doc. No. 30-10), and sat for a deposition.  In his initial report, he concludes as follows:

> Based on the information presented above, IEI does herein conclude to a reasonable degree of engineering certainty, that the cause of this fire was the improper installation of the subject connectors without the required insulation. It is unknown if PPL installed these connectors, but if not, they should have recognized the dangerous condition of these connectors when they were on site troubleshooting the electrical system just seven months before the fire. There is no information to indicate the dangerous condition of these splices was not readily visible at that time. Therefore, the proximate cause of this fire is the failure of PPL to either properly install the subject splices or their failure to recognize and address the dangerous condition of these splices that resulted in this fire.

(Doc. No. 30-8 at 3.)  In his supplemental report, upon review of Defendant's expert Mr. Schaal's report, he states that:

> Therefore, I conclude that it is more reasonable than not that those dangerous splices were in place when PP&L inspected the lines on October 19, 2021. Had they done a proper inspection, the dangerous condition that was present would have been removed and this fire would have been prevented. Thus, there is nothing in Mr. Schaal's report that would cause me to change or modify any of the conclusions of my original report.

(Doc. No. 30-10 at 3.)

Defendant states that it seeks to exclude Mr. Wald's opinion "that the subject uninsulated bug connectors were present on the power lines to the Insured Premises in October 2021, to be

observed by PPL." (Doc. No. 33 at 13.)  Although Defendant does not actually quote the

language of Mr. Wald's report, or cite to a specific portion of Mr. Wald's conclusion that it seeks

to exclude, the Court interprets the motion as an effort to exclude the entirety of his conclusion.

The two challenged elements—(1) that the bug connectors were on the power lines in October

2021; and (2) that they were observable by PPL at that time—do not appear to be separable from

the remainder of Mr. Wald's conclusion paragraphs.  Defendant argues that Mr. Wald's

testimony "is not supported by any facts or data of record or any scientific analysis or

methodology and would not be helpful to the trier of fact." (Doc. No. 30 at 14.)  In support of

this argument, Defendant points to Mr. Wald's deposition, stating that "Wald agreed with

[Plaintiff's expert] Schaal that there is no evidence indicating or showing that the subject bug

connectors were present when PPL was at the Insured Premises seven (7) months before the

fire," and that this "statement alone is enough to exclude Wald's opinion that the subject

insulated bug connectors were present on the power lines to the Insured Premises on October 29,

2021, as pure speculation." (Doc. No. 33 at 15.)  The testimony that Defendant references is,

more fully, as follows:

> Q.    I'm going to represent to you that the quote from [Schaal's] report is that
> these connectors—excuse me—would be that there is no evidence in this
> case indicating or showing that the connectors in question were present
> when PPL was on site seven months prior to the fire?
>
> A.    Okay.
>
> Q.    So my question to you is, can we agree that he's not stating definitively that
> they weren't there; he's just saying there's no evidence?
>
> A.    Okay. I'll agree with you. And it should be seven months instead of six
> months. I had put six months, but he's correct at seven months.

Q.      And you can agree with that, right; there's no evidence showing that they were there? There's no pictures of them there in October 2021?

A.      Correct. Correct. There's no evidence that [they] were there, and no evidence that they weren't.

(Doc. No. 30-11 at 41–42.)  By way of rebuttal, Plaintiff asserts:

The motion as to Mr. Wald is limited solely to the concept that there is no evidence that the subject connectors were present at the house when defendant came there in October 2021.  Essentially, defendant has already admitted that if the connectors were present in October 2021, when they came to do line repairs, that they should have 1) inspected the lines to ascertain the issue, 2) seen the uninsulated connector, and 3) removed the same.  However, they contend that between October 2021 and May 2022, some unknown person gained access to these lines and installed these connectors.  Defendant bases their position upon their belief that if they denigrate Ms. Black's testimony enough, they can somehow ignore their legal responsibilities when conducting line inspections and get away with it.  Mr. Wald was unequivocal in his testimony that that it would be highly unusual for "somebody to install those splices without turning off the power, and PP&L didn't turn off the power."[]  He was also unequivocal that he accepts the testimony of Ms. Black that she had no memory of anyone performing electrical work at the house, other than defendant because "[s]he's the only one that we can rely on for information. I have no reason to believe she would be deceitful or not tell the truth, and she's the only source of information we have about what went on at her property."[] Mr. Wald noted that Ms. Black's testimony was about activities in the seven months before the fire as opposed to ten years before the fire and that a claim that her testimony about those months was unreliable was baseless.

(Doc. No. 36 at 7–8.)  Plaintiff also states that:

[f]urthermore, the entire motion is based upon a lack of evidence, which is untrue. The fact is there is evidence to support these claims; it is simply that defendant disagrees with the same, which is not the basis for a Daubert motion.

. . .

Ignoring testimony is not how the civil system works.  The motion must be denied.

(Id. at 8–9.)

Plaintiff, in asserting that "the entire motion is based upon a lack of evidence" (id.),

mischaracterizes Defendant's argument, which is that the challenged opinion "is not supported

by any facts or data of record <u>or any scientific analysis or methodology and would not be helpful</u> <u>to the trier of fact.</u>" (Doc. No. 30 at 14 (emphasis added).)  This is a reference to the second and third requirements of Rule 702—reliability and fit.  Plaintiff's rebuttal makes no direct mention of either the reliability or fit of Mr. Wald's opinions, nor of his qualifications as an expert, and, in the relevant section of its brief, does not cite to any authority in support of its position.  Still, the Court must apply the Rule 702 standard to Mr. Wald's opinions, and therefore the Court turns to Mr. Wald's qualifications and the reliability and fit of his challenged opinions.

### a.    Qualifications

Upon careful consideration of the parties' briefing and exhibits, and the applicable law, and for the following reasons, the Court concludes that Mr. Wald is qualified to testify as an expert in this matter.  The Court was unable to locate Mr. Wald's curriculum vitae on the docket,[4] but in his deposition he testified that he has been an electrical engineering consultant and the president of IEI Consulting since 1999.  (Doc. No. 30-11 at 10.)  He obtained his bachelor's degree with a "dual major with electrical engineering and pre-med" from Cornell University in 1977.  (Id. at 11.)  He later obtained his master's degree in electrical engineering.  (Id.)  After college, he worked in "field service engineering," which involved "installation and servicing of electrical and electrical mechanical equipment."  (Id. at 7.)  In this field, he worked for GE Medical Systems, Gould Electronics, and MacDonald Detwiler.  (Id.)  After exiting the field, he "started a little business building homes," and did that for "close to three years," after

---

[4]  As the Court discussed above with respect to Mr. McAdams, under Federal Rule of Civil Procedure 26, an expert report "must contain . . . a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition."  See Fed. R. Civ. P. 26(a)(2)(B)(iv).  The Court is unable to locate such a list in Mr. Wald's reports.  The Court also cannot locate in his reports "a statement of the compensation to be paid for the study and testimony in the case" as required by Rule 26(a)(2)(B)(v).

22

which he joined the electrical team at Forensic Technologies International where he "started investigating accidents and injuries and things like that that involved electrical equipment." (Id. at 8.)  After about "five or six" years there, he opened his own company, IEI Consulting, where he has worked since 1999.  (Id.)

As cited above, "a broad range of knowledge, skills, and training qualify an expert." See In re Paoli, 35 F.3d at 741.  Mr. Wald has years of experience in the fields of electrical engineering and accident investigations, and meets the Rule 702 qualifications threshold for purposes of this case.  Having concluded that Mr. Wald is qualified to offer testimony in this case, the Court turns to an assessment of the reliability and fit of his challenged opinion.

### b.    Reliability

As set forth more fully above, the reliability inquiry focuses on the expert's methodology and whether he has "good grounds" for the opinion offered.  See In re Paoli, 35 F.3d at 746.  In his initial report, Mr. Wald details his investigation methodology:

> **Investigation**—IEI reviewed the report of Certified Fire Investigator Lee McAdams, the deposition of Thomas Grosz, the deposition of Loretta Black, and Discovery produced by Philadelphia Power and Light (PPL). The following information was found to be particularly relevant.
>
> Ms. Black testified that there was a time in 2021 when the power line came down in her backyard and PPL came to her yard and repaired it. PPL records show that on October 19, 2021, Ms. Black called and reported she had no lights. PPL sent a technician to the site who determined that the cause was a "non-PPL problem." No further explanation was provided. Ms. Black testified that she has never had an electrician come to the home and that PPL was the only one who did any electrical work at the property.
>
> Photos of the subject splices show that these are STR butt splices often used for connecting two sections of large-gauge stranded aluminum wiring. However, whenever these splices are used on energized wiring, they must be covered with some sort of insulation to prevent accidental contact with any conductive surface as referenced in [the National Electrical Code] (2020) 110.14(b). Typically, the

23

insulation is hand-wrapped insulating electrical tape. Plastic covers can also be used. In this instance it is evident that no such protection was applied to these bare connectors.

Mr. Grosz testified that as part of determining that the power problem on October 2021 was a "non-PPL problem" the service person would have to examine all of the PPL equipment up to the meter. The subject connectors would be part of that system since they are connecting the overhead lines to the service cable that runs to the meter.

It should be noted that installing these connectors would normally require that the power be turned off at the PPL pole. There are no records to indicate power was ever turned off between the time PPL came to the property on October 19, 2021, and the time of the fire. Thus, one must conclude the dangerous condition of these splices was present when PPL was on site on October 19, 2021.

**Discussion**—The subject connectors are commonly used in industrial, commercial and even some residential applications, but they are not typically used by electric utilities for connection to service lines. Mr. Grosz testified that they were not PP&L connectors, although there is no indication that anyone else has worked on these lines. However, anyone familiar with electrical power should know that these connectors have to be insulated when connected to energized lines. Thus, when PPL was on site on October 2021 and investigating a lack of power to the home, their servicemen should have recognized this obvious hazard and at least reported it to the homeowner, even if they were not the ones who installed the subject connectors as part of their service call.

(Doc. No. 30-8 at 3.)  In his deposition, Mr. Wald further details his methods and the bases for

his opinions:

Q.    Was [power] out to the subject premises, Ms. Black's home?

A.    I can't say with certainty.  She didn't have lights.  Now I don't know that's because she had a broken switch or her light bulbs were burned out.  But the only thing that I can rely on is her saying she had no lights.  And of course, Mr. Grose saying that there wasn't any problem on the PPL line, I presume he put a meter on the wires and measured voltage to say there's no PP&L problem. That would be standard procedure.

Q.    So you could—it sounds like it could be determined it was not a PPL problem just using a voltage meter as opposed to examining every part of the system?

24

A.    Well—

MR. BRENNAN:  Objection to form.  You can answer.

A.    Yeah.  You could—if you used a meter at—at the meter, a volt meter at the meter, you could determine if there was power coming in on the lines.  But you should still inspect the lines because there might be a break.  There might be something intermittent.  You might have a damaged line that – that's providing power at the moment he puts his meter there, but then goes off a minute later.  So just measuring voltage wouldn't be conclusive, but it would be a valuable piece of information.

Q.    And that's—that opinion that it wouldn't be conclusive, what are you basing that on?

A.    Principles of electricity and electric distribution systems.

. . .

Q.    And you just said this, so I'm going to pivot to that, but the very last page of the Investigation section, it should be noted that installing these connectors would normally require that the power be turned off to the PPL pole.  But there is a scenario in which someone could work on these hot and change them without turning the electricity off?

A.    They could if they want to risk their lives.  Yes, ma'am.

Q.    So if they could be worked hot or worked on without disconnecting the power, then the lack of records really doesn't tell us a whole lot, right?

A.    That's correct.

. . .

Q.    So your ultimate conclusion here, I think, is that when PPL was on site on October 2021, and investigating the lack of power, they should've recognized, I think you call it, an obvious hazard; is that correct?

A.    That is correct.

. . .

Q.     So we're not ruling out the possibility that they could've been insulated in October of 2021?

25

A.      I would guess it's possible, but it's extremely unlikely.  Personally, I don't know if they make those plastic snap-ons to fit this type of connector, but secondly I would have a hard time believing that there wouldn't be at least some residue of tape visible, either on the splice or the wire—the wire insulation just before the splice and after the splice.

. . .

Q.      Sorry.  The subject splices, the ones that you are in the photos that you looked at.  I'll rephrase it.  My understanding of your testimony is that you're saying that the subject splices, the ones that are in the photographs, were there in October 2021 because Ms. Black didn't have any memory of anyone changing them out before then?

A.      That, and that it would be highly unusual for somebody to install those splices without turning off the power, and PP&L didn't turn off the power.  I think those two things combined are what have me convinced that those splices looked just like that seven months before the fire when PP&L was there.

Q.      Is there anything else, any other fact, piece of evidence, anything, that supports that?

A.       No.  Just like there's absolutely nothing that would suggest they weren't there.  We have to go by what evidence we have and what facts we have, and there's nothing to even suggest that those splices were installed in that seven months.

(Doc. No. 30-11 at 25–36.)

Upon careful consideration of the parties' briefs, the record in this case, and the applicable law, and for the following reasons, the Court concludes that Plaintiff has met its burden to demonstrate that Mr. Wald's opinions are the product of reliable principles and methods.  In his initial report, Mr. Wald describes that he reviewed the reports of other witnesses, as well as photographs from the scene.  (Doc. No. 30-8 at 3.)  In his deposition, he expands on the bases for his conclusions—his educational background, with undergraduate and master's degrees in electrical engineering (Doc. No. 30-11 at 10), and also "[p]rinciples of

26

electricity and electric distribution systems." (Id. at 27.)  He also refers in his report to the National Electrical Code provision pertaining to the insulation of bugs or "splices."  (Doc. No. 30-8 at 3.)  However, he responded no when counsel asked in his deposition whether he "review[ed] any literature or other information," or "trade publications," or "anything like that." (Id. at 20.)  He stated that "[t]his is such a clear and obvious matter.  I didn't need to review anything."  (Id.)

As previously discussed, in an investigation of this sort, "reports, photographs, and third-party observations . . . are facts or data of a type reasonably relied upon by experts in the field of fire cause and origin."  See Gardner, 211 F.3d at 1054.  There is not a universally correct or appropriate way for an expert witness to show their work.  See Kumho Tire, 526 U.S. at 150 (explaining that various factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony").  Still, the "expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."  See Fed. R. Evid. 702, 2000 amendments.

Given the absence of concrete proof that the bugs were on the lines and insulated in October 2021, Defendant asserts that any testimony on this point by Mr. Wald would be speculative and "based on assumptions and not supported by any methodology."  (Doc. No. 33 at 9.)  Defendant is correct that an opinion in this context will rely on certain inferences and assumptions, and a party and expert must demonstrate that the methodology involves more than speculation or subjective belief.  Here, the Court finds that the proffered method rises above that level and satisfies the burden of Rule 702.  See W. Am. Ins. Co. v. Jersey Cent. Power & Light

Co., No. 03-cv-06161, 2008 WL 5244232, at *8 (D.N.J. Dec. 15, 2008) (finding an expert's

report "was not speculative" where it "concludes that the probable cause of the fire was an arcing

event, rejecting the other possibilities as implausible").  Unlike Mr. McAdams's opinion that

PPL "apparently repaired" the power line "and no insulators were used to prevent this" (Doc.

No. 34 at 73), Mr. Wald opines more narrowly that whether or not "PPL installed these

connectors . . . they should have recognized the dangerous condition [of the connectors] . . .

when they were on site troubleshooting the electrical system just seven months before the fire"

(Doc. No. 30-8 at 3).  He supports this conclusion with references to the record, his observations

and experience, and his background as an electrical engineer.  These suffice to meet the burden

to demonstrate "good grounds" for his opinions.  See In re Paoli, 35 F.3d at 746.  Defendant

impugns the evidence upon which Mr. Wald relies, and argues that Mr. Wald is making

"credibility determinations," which are "the province of the jury."  (Doc. No. 33 at 15.)

However, as described above, the Court finds that the facts relied upon here are of the type

"reasonably relied upon by experts in the [] field," and the proper mechanism for resolving

disputes of this kind is not to exclude the testimony.  See Stecyk v. Bell Helicopter Textron, Inc.,

295 F.3d 408, 414 (3d Cir. 2002) (internal citations omitted).  Instead, the "burden of exploring

the facts and assumptions underlying the testimony of an expert witness [is] on opposing counsel

during cross-examination."  See id.; see also Breidor v. Sears, Roebuck & Co., 722 F.2d 1134,

1139 (3d Cir. 1983) (finding that an expert's "thorough investigation . . . indicates a solid

foundation for his testimony; the mere fact that Emory could not identify a specific defect does

not mean that he was speculating when he offered his expert opinion as to the cause of the fire").

An examination of the <u>Daubert</u> factors is mixed but ultimately leans in favor of admission.  As cited <u>supra</u>, the factors include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

<u>See</u> <u>In re Paoli</u>, 35 F.3d at 742 n.8.  The first three factors are not in Plaintiff's favor—Mr. Wald's hypotheses are not testable in the formal sense, nor has the method been subject to peer review, and it does not have a known or potential rate of error.  This is, in part, due to the nature of fire investigations, which are markedly different from certain scientific domains.  <u>See</u> <u>Pineda</u>, 520 F.3d at 248 (explaining that a proper assessment of the relevant factors must demonstrate "the appropriate level of flexibility required by Rule 702"); <u>see also</u> <u>Kumho Tire Co.</u>, 526 U.S. at 151 (describing that it "might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist").  In cases like this one, courts often scrutinize whether a fire expert adhered to NFPA standards and employed other markers of a typical fire investigation.  As discussed previously, the Court finds that Mr. Wald's fire investigation methods were within this accepted norm—and therefore factors four, five, and six weigh in his favor.  As to factor seven, he has significant qualifications as an electrical engineer and fire expert.  On balance, the factors weigh in favor of the admission of his testimony.  The Court next turns to an assessment of the fit of his opinions to the case.

c.    Fit

As noted supra, with respect to "fit," "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." See Schneider, 320 F.3d at 404.  A non-scientific expert "must apply his experience reliably to the facts; his opinions must be well-reasoned, grounded in his experience, and not speculative." See Jackson v. City of Pittsburgh, Pa., No. 07-cv-00111, 2010 WL 3222137, at *9 (W.D. Pa. Aug. 13, 2010) (internal citations omitted).  Although Defendant asserts that Mr. Wald's testimony "would not be helpful to the trier of fact" (Doc. No. 30 at 14), Defendant does not expand on this argument.

Upon careful consideration of the parties' briefing and exhibits, and Mr. Wald's reports, and the applicable law, the Court finds that Mr. Wald's testimony is relevant to the negligence claim at issue and fits the case.  However, the Court cautions that Mr. Wald may not testify as to legal duties arising under the law.  See United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991) (stating that "testimony concerning custom and practice was proper so long as the expert did not give his opinions as to legal duties that arose under the law").

C.    **Plaintiff's Motion to Exclude the Opinions of Michael E. Schaal**

1.    **The Proposed Expert Report and Testimony of Michael E. Schaal**

The Court now turns to Plaintiff's motion to exclude certain testimony and opinions of Michael E. Schaal.  Defendant tendered Mr. Schaal to "investigate the subject fire and determine, if possible, the origin, cause, and potential responsible party."  (Doc. No. 35 at 3.)  Mr. Schaal issued a report (Doc. No. 30-9) and sat for a deposition (Doc. No. 31-7).

Mr. Schaal offers nine conclusions in his report, of which Plaintiff specifically challenges opinions five, six, and nine:

1.      The area of fire origin was located on the rear, second-floor balcony of 2452 N. 4th Street.

2.      The cause of the fire is consistent with abnormal electrical activity on the subject bugs.

3.      The material(s) first ignited was consistent with the sofa and/or other stored combustible materials in the area of origin.

4.      The act or omission that brought the ignition source and the material first ignited together is consistent with abnormal electrical activity associated with the uninsulated bugs at 2450 N. 4th Street, causing an arcing event that ignited the sofa or other stored combustible material on the balcony.

5.      PPL was not placed on notice in a timely fashion by the plaintiff[]s in order to conduct a joint examination with the defendant[']s experts.

6.      The opinions of plaintiff's experts Michael Wald & Lee McAdams are based on speculation that the subject bugs were in place during PPL's inspection at the subject property and, therefore, not reliable.

7.      There is no evidence or data to support the claim that PPL installed the bugs in question. In fact, all the testimony shows that PPL does not use or install them.

8.      It is our experience that some electricians will make connections between the customer service entrance cable and the utility power supply because they do not want to wait or coordinate with the utility company to restore power and work it hot.

9.      Mr. Michael Wald concluded that it is unknown if PPL installed the subject bugs. Mr. Thomas Grosz testified that PPL does not use or install the subject bugs. Therefore, based on all the factual data reviewed to date, we have concluded that PPL did not cause or contribute to the subject fire.

(Doc. No. 30-9 at 13.)  Plaintiff challenges Mr. Schaal's qualifications and also argues that

opinions six and nine "run afoul of all three prongs under Elcock and should be precluded at

trial." (Doc. No. 32 at 10.)  As to opinion five, Plaintiff asserts that:

[t]o permit an expert to take the stand, and insinuate that something may have been changed, based solely upon the fact that Mr. Schaal himself was not retained, is highly improper.  This should be precluded and stricken from the report and trial.

31

(Doc. No. 32 at 13.)[5]  The Court addresses each of Plaintiff's specific challenges in turn, after first examining Mr. Schaal's qualifications to offer expert testimony.

### 2.    Qualifications

With respect to his qualifications, Plaintiff argues that "Mr. Schaal is an origin and cause expert.  He is not an electrical engineer, has no specialized training into any standard of care for electrical line workers, and is not qualified to opine on the PP&L standard of care when it performed its line inspection in October 2021." (Doc. No. 32 at 10.)  Defendant asserts in response that:

> Schaal is highly qualified, by education and experience, to render the opinions contained in his report and deposition testimony.[] In addition to his qualifications as a fire investigator and his experience investigating fires with electrical causes, he has specific education about overhead power lines and the installation of bug connectors like those at issue in this litigation.

(Doc. No. 35 at 10.)  In a footnote, Defendant further specifies that "Plaintiff asserts that Schaal is not qualified to opine on the standard of care for PPL inspecting the line in October 2021. While Defendant disagrees with this assertion, Schaal did not offer any such opinions."  (Id.)

Upon careful consideration of the parties' briefs, Mr. Schaal's report and deposition, the record in this case, and the applicable law, and for the following reasons, the Court finds that Mr.

---

[5]  Although neither party specifically names conclusion five in their briefing, Plaintiff asserts that "Mr. Schaal should be precluded from making any conclusions [sic] spoliation or defendant's inability to observe the scene" (Doc. No. 32 at 11) and Defendant responds that "Schaal has ample qualifications to opine on the importance of a scene inspection in investigating a fire loss. The statement by Schaal that PPL was not placed on notice in a timely fashion to complete a scene inspection is not so much an opinion as it is a fact underlying his opinion." (Doc. No. 35 at 13–14).  The parties are therefore effectively disputing conclusion five of Mr. Schaal's report, which is that "PPL was not placed on notice in a timely fashion by the plaintiff[]s in order to conduct a joint examination with the defendant[']s experts."  (Doc. No. 30-9 at 13.) Accordingly, the Court will consider the parties' arguments on this point to reference the admissibility of conclusion five.

Schaal is qualified to testify as an expert in this matter.  Mr. Schaal graduated from the Anne Arundel County Fire Academy in 1977 and obtained an associate's degree in Fire Protection Technology from Catonsville Community College in 1981.  (Doc. No. 30-9 at 15.)  Mr. Schaal later obtained a Bachelor of Science degree in Fire Science at the University of Maryland, University College in 1986.  (Id.)  From 1977 through 1991 he held numerous positions at the Anne Arundel County Fire Department, including Lieutenant, Captain, Battalion Chief, Division Chief, Acting Deputy Chief, and Fire Marshal.  (Id. at 18.)  From 1991 to 1998 he was a "Senior Cause and Origin Investigator" at FTI Corporation.  (Id.)  From 1991 to present, he has been the President and CEO of Fire & Arson Investigation Consultant, Inc..  (Id.)  He has participated in numerous trainings, including "Fire Investigative Approaches" and the "National Fire, Arson, & Explosion Investigation Training Program," obtained several professional certifications, including "Fire and Explosion Investigator" by the National Association of Fire Investigators, and he has taught courses relating to fire investigations at various organizations including the National Fire Academy.  (Id. at 17–18.)

As described above, "a broad range of knowledge, skills, and training qualify an expert." See In re Paoli, 35 F.3d at 741; accord Waldorf, 142 F.3d at 627 (noting that a proposed expert witness's generalized knowledge or practical experience may be sufficient to qualify him as an expert).  Given Mr. Schaal's extensive education and experience in the field of fire investigations, the Court finds him qualified to offer testimony in this case, without the limitations sought by Plaintiff—having reviewed the nine opinions, the Court is in agreement that Mr. Schaal does not seek to offer any opinions as to the "standard of care for electrical line workers" (Doc. No. 32 at 10), to which Plaintiff asserts he is unqualified to testify.  See

33

Holbrook, 80 F.3d at 782 (stating that it would be "an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate").  The Court turns next to the reliability and fit of Mr. Schaal's contested opinions.

### 3.      Reliability

Plaintiff challenges Mr. Schaal's opinions five, six, and nine under the reliability requirement of Rule 702.  As noted above, the opinions are as follows:

> 5.      PPL was not placed on notice in a timely fashion by the plaintiff[]s in order to conduct a joint examination with the defendant[']s experts.
>
> 6.      The opinions of plaintiff's experts Michael Wald & Lee McAdams are based on speculation that the subject bugs were in place during PPL's inspection at the subject property and, therefore, not reliable.
>
> 9.      Mr. Michael Wald concluded that it is unknown if PPL installed the subject bugs. Mr. Thomas Grosz testified that PPL does not use or install the subject bugs. Therefore, based on all the factual data reviewed to date, we have concluded that PPL did not cause or contribute to the subject fire.

(Doc. No. 30-9 at 13.)

As to opinions six and nine, Plaintiff asserts that "Mr. Schaal's conclusions are literally his subjective belief or unsupported speculation on what [electrical] work Ms. Black allegedly told [Harrisburg Police Detective Jon] Fustine about based on Mr. Fustine's recollection."  (Doc. No. 32 at 10.)  Plaintiff states further that:

> [i]f the expert conclusion is based on his "belief", under Daubert, the conclusion is inadmissible.  Mr. Schaal offers no method he used in reaching his conclusion, nor a basis for his qualifications to ignore testimony and interpret tea leaves to reach a definitive conclusion that defendant is blameless in this case.

(Id. at 11.)  Defendant responds, as to opinions six and nine, that:

34

Schaal is neither speculating nor stating a subjective belief when he points out that Plaintiff[']s experts' opinions are based on speculation. He is speaking from experience as a fire investigator and specifically his experience with the proper way to perform an investigation per NFPA 921. This includes consideration of all the facts and data, not cherry picking of the fact or data that fits the expert's hypothesis.

. . .

Schaal did not need to disregard Ms. Black's deposition testimony or make any sort of credibility determination to issue his opinions. He simply reviewed her testimony and considered it in context with the testimony of other witnesses, as well as all other available facts and data. This included, but was not limited to, the testimony of Detective Fustine regarding Ms. Black's prior statements that she had electrical work done at the property, the testimony and affidavit from Thomas Grosz that PPL does not use or install the kind of bugs that were on the power lines to the Insured Premises at the time of the fire, the records from PPL from the October 29, 2021 no lights call reflecting there was no outage and it was a non-PPL problem, the report from McAdams that stated Chief Enterline thought Ms. Black had an electrician install the bugs, and the report from Wald stating that there was no evidence that PPL installed the bugs. Using all these facts and data, and employing the methodology set forth in his report, Schaal concluded that PPL did not cause or contribute to the subject fire.

. . .

Plaintiff does not point to any factual data relied on by Schaal that is incorrect or improper. There is no basis to preclude the conclusion from Schaal that PPL did not cause or contribute to the subject fire. That conclusion is solidly based on the statements and testimony of all witnesses, all documents from first responders, PPL, and Plaintiff.

(Doc. No. 35 at 11–13.)

Lastly, as to opinion five, Plaintiff seeks to preclude Mr. Schaal from "making any conclusions [sic] spoliation or defendant's inability to observe the scene." (Doc. No. 32 at 11.) Plaintiff cites to a litany of evidence in the record, stating that the evidence "goes against the reliability of the conclusion in that the factual evidence clearly refutes this conclusion." (Id.) Further:

35

> [t]o permit an expert to take the stand, and insinuate that something may have been
> changed, based solely upon the fact that Mr. Schaal himself was not retained, is
> highly improper.  This should be precluded and stricken from the report and trial.

(Id.)  Defendant, in rejoinder, states that "Schaal has ample qualifications to opine on the importance of a scene inspection in investigating a fire loss," and that "Schaal should be permitted to testify at trial about how the inability to inspect the fire scene, or any artifacts, impacted his investigation and opinions."  (Doc. No. 35 at 13–14.)

Upon careful consideration of the parties' briefing and exhibits, Mr. Schaal's report and deposition, and the applicable law, and for the following reasons, the Court finds that Defendant has met its burden to demonstrate that Mr. Schaal's opinions reflect the reliable application of principles and methods to the facts of the case.

The proponent of expert testimony must demonstrate "to the court that it is more likely than not" that "the testimony is the product of reliable principles and methods."  See Fed. R. Evid. 702.  Mr. Schaal recounts his methodology in significant detail and describes the elements of his background and the experiences upon which he relies.  See (Doc. No. 30-9).  In particular, he "performed a review of discovery documents" including Plaintiff's experts' reports, the deposition testimony of Ms. Black and others, photographs of the scene, and the police incident report, "utilized" the "methodology outlined in NFPA 921," and "relied on [his] education, training, and experience" as a fire and explosion investigator and retired fire marshal.  (Doc. No. 30-9 at 3–5.)  From his assessment of photographs of the scene, Mr. Schaal notes the identification marks on one of the bugs at issue and states that "these particular bugs can be purchased from various electrical supply houses."  (Id. at 11.)  Further, based on the testimony of PPL's witness that these "were not PPL connectors," and contrasted with photographs of PPL

36

bugs, Mr. Schaal concludes that it "is clear that the connectors involved in this fire are not PPL connectors." (Id.) Upon his review of the testimony of various witnesses, he further concludes that there "is no evidence in this case indicating or showing that the connectors in question were present when PPL was on-site seven months prior to the fire" and that it "is purely speculative that these connectors were in place during PPL's visit." (Id.)

As the Court stated supra with respect to Plaintiff's experts, the kinds of records that Mr. Schaal references in his report are "reasonably relied upon" by experts in the field of fire investigation. See Gardner, 211 F.3d at 1054. Further, the "NFPA 921 is typically considered to 'provide[] a reliable fire causation determination methodology.'" See Ford, 311 F. Supp. 3d at 679. In another case in this Circuit in which the opposing party challenged the reliability of Mr. Schaal's opinions, the district court—after exhaustively examining his methods—found that the Rule 702 burden was met and permitted his testimony. See Matter of Soued, 689 F. Supp. 3d 1, 15 (D.N.J. 2023) ("[g]iven Schaal's investigation and his reliance on the NFPA 921 as a guide, the Court finds his opinions are reliable under Rule 702 and Daubert to warrant admission in evidence"). The Court finds that, here too, his method meets the Rule 702 reliability threshold— the materials upon which he relies, in combination with his background and experience, constitute "good grounds" for his testimony. See In re Paoli, 35 F.3d at 746. Whereas Plaintiff argues that Mr. Schaal is "ignore[ing] testimony and interpret[ing] tea leaves" (Doc. No. 32 at 11), the Court is persuaded instead by Defendant's characterization of Mr. Schaal's methodology—he "reviewed [Ms. Black's] testimony and considered it in context with the testimony of other witnesses, as well as all other available facts and data" (Doc No. 35 at 11–12).

Because "there is a logical basis for [his] opinion testimony, the credibility and weight of that testimony is to be determined by the jury." See Breidor, 722 F.2d at 1138–39.

The Court also finds that an application of the Daubert factors weighs in favor of admission, and the analysis is similar to the Court's application of these factors with respect to Mr. Wald. The first three factors are not favorable—in particular, the method is not subject to peer review and it does not have a known or potential rate of error, at least not in the traditional sense of published academic literature. See In re Paoli, 35 F.3d at 742 n.8. However, in the context of this case, the Court finds that these are outweighed by other relevant factors. See Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806–07 (3d Cir. 1997) (articulating that "these factors are neither exhaustive nor applicable in every case"). Mr. Schaal relied on the NFPA, which provides "standards controlling the technique's operation," Mr. Schaal's methods are "generally accepted" within the fire investigation field, and there is a strong relationship between the technique and methods that courts have consistently found to be reliable. See In re Paoli, 35 F.3d at 742 n.8; see also Hoang v. Funai Corp., 652 F. Supp. 2d 564, 567 (M.D. Pa. 2009) (collecting cases and finding that "[s]everal courts, including this one, have recognized that NFPA 921 offers a comprehensive and detailed treatment for fire investigation and have held its methodology is reliable for purposes of Rule 702"). Factors four, five, and six weigh in favor of admission. As to factor seven, Mr. Schaal is highly qualified in the relevant field. The Court finds that, on balance, Defendant has met its burden to demonstrate that Mr. Schaal's opinions are the result of the application of reliable principles and methods, and turns to an assessment of the fit of Mr. Schaal's opinions to the facts of this case.

4.    **Fit**

Plaintiff argues that, with respect to Mr. Schaal's opinions, "as for fit, there isn't any. The expert conclusions amount to little more than accepting vague facts as truth and ignoring the sworn testimony of Ms. Black." (Doc. No. 32 at 11.)  Further, Plaintiff states that "[p]ermitting an expert witness to take over what is solely a jury question is not permitted under the law." (Id.)  Although Defendant argues that Mr. Schaal should be permitted to testify, Defendant's brief fails to squarely object or otherwise respond to Plaintiff's argument that Mr. Schaal's opinions do not fit the case.

Upon careful consideration of the parties' briefing and exhibits, Mr. Schaal's report and deposition, and the applicable law, and for the following reasons, the Court finds that opinions five and six do not fit the facts of the case, and will be excluded, but that opinion nine fits the case and will be permitted.  As to opinion five—that "PPL was not placed on notice in a timely fashion by the plaintiff[]s in order to conduct a joint examination with the defendant[']s experts" (Doc. No. 30-9 at 13)— the Court finds that Defendant has not met its burden to demonstrate that this opinion fits the facts of the case.  See Schneider, 320 F.3d at 404 (stating that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact").  Defendant does not assert any affirmative defenses in its answer to the complaint (Doc. No. 5) pertaining to spoliation, nor does it articulate in its briefing any concrete reasons or cite to any authority to support the argument that the testimony would assist the trier of fact in determining the issue of Defendant's potential negligence.  As such, the Court will exclude opinion five.

Opinion six—that the "opinions of plaintiff's experts Michael Wald & Lee McAdams are based on speculation that the subject bugs were in place during PPL's inspection at the subject property and, therefore, not reliable" (Doc. No. 30-9 at 13)—also warrants exclusion. As presented, it is less an expert opinion as it is an assessment of whether the opposing expert meets the Rule 702 standard, and Mr. Schaal may not make legal conclusions. See Leo, 941 F.2d at 196 (stating that "testimony concerning custom and practice was proper so long as the expert did not give his opinions as to legal duties that arose under the law"). As basis for the opinion, Mr. Schaal states that "[s]peculative conclusions can lead to challenges in legal proceedings since courts often require expert testimony to be based on reliable methodologies . . . [t]herefore, we conclude that Mr. Wald's conclusions are based on speculation and are not valid." (Doc. No. 31-6 at 12.) Such testimony is thus an "opinion[] as to legal duties that ar[i]se under the law." See Leo, 941 F.2d at 196; see also United States v. Keystone Biofuels, No. 1:17-cr-00143, 2019 WL 2996951, at *6 (M.D. Pa. Feb. 25, 2019) (excluding expert testimony that consisted of legal conclusions and explaining that "an expert may testify that biodiesel tested at a particular time had, or did not have, certain characteristics, but that expert may not then state the conclusion that, as a result of those characteristics, the tested biodiesel did or did not comply with [the law]"). Experts can, of course, rebut or otherwise attack the methods of opposing experts. See In Re: Johnson & Johnson Talcum Powder Prods. Mktg, Sales Pracs., and Prods. Liab. Litig., No. 16-md-02738, 2026 WL 161184, at *13 (D.N.J. Jan. 20, 2026) (quoting Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc., 829 F. Supp. 2d 802, 835 (D. Minn. 2011) (articulating that "courts recognize that 'the proper role of rebuttal experts [is] to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiffs' experts' reports'"); see also Sater v.

40

Republic Servs. of Indiana Transp. LLC, No. 23-cv-00403, 2025 WL 3513821, at *5 (N.D. Ind. Dec. 8, 2025) (stating that "critiques of another expert's methods or results are standard fare in the battle of the experts").  Mr. Schaal's opinion—employing the language of the legal standard of reliability rather than rebutting or attacking alleged methodological flaws of the opposing experts—would intrude upon the Court's role.  See United States ex rel. Penelow v. Janssen Prods., LP, No. 12-cv-07758, 2022 WL 94535, at *5 (D.N.J. Jan. 10, 2022) (stating that "the question of 'fit' remains," which "necessarily includes ensuring that he will not provide improper legal opinions that will intrude on the Court's role in explaining the law to the jury").  Although Mr. Schaal may not offer opinion six as formulated, he may testify as to specific alleged methodological flaws that the opposing experts utilize that he has identified in his report and deposition.

Lastly, the Court finds that opinion nine—Mr. Schaal's conclusion that "PPL did not cause or contribute to the subject fire" (Doc. No. 30-9 at 13)—will assist the trier of fact in determining the negligence claim at issue, and therefore it will be permitted.

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Plaintiff's motion (Doc. No. 31) to exclude certain testimony and opinions of Mr. Schaal, and grant in part and deny in part Defendant's motion (Doc. No. 30) to exclude certain testimony and opinions of Mr. McAdams and Mr. Wald.  An appropriate Order follows.